IN THE

# SUPREME COURT OF NEBRASKA.

## JANUARY TERM, A.D. 1888.

PRESENT:

HON. M. B. REESE, CHIEF JUSTICE.
" AMASA COBB, } JUDGES.
" SAMUEL MAXWELL,

JEFFERSON LONG, PLAINTIFF IN ERROR, v. THE STATE
OF NEBRASKA, DEFENDANT IN ERROR.

1. Criminal Law: CONFESSIONS. While the confessions or
statements of a third party, not made in the presence of the
accused, are inadmissible in any form in a prosecution against
a prisoner charged with the offense of aiding and abetting such
third party in the commission of a murder, yet it is competent
to prove the statements of the accused, made against his in-
terests, in a conversation in which he is informed that a con-
fession has been made by such third party, he being the princi-
pal indicted with the accused, but not in custody, and in such
case the whole conversation between the witness and accused
may be given in evidence.

2. ———: EVIDENCE: CONVICTION OF FELONY. A witness was
called and examined by the prosecution. On his cross-examina-
tion he was asked if he had ever been convicted of a felony and
sentenced to prison. He answered that he had been convicted of
the crime of forgery by the district court of Arapahoe county,
Colorado, and that he served a part of the term for which he

3

was sentenced, when he was pardoned by the governor of that state. The conviction was also proven by other testimony, to which the prosecution made no objection, the fact being virtually admitted. On the part of the defense the record of the conviction was offered in evidence, to which objection being made it was excluded. *Held*, No error, or if erroneous it was without prejudice, the fact having been already unquestionably established.

3. ———: IMPEACHING WITNESS. Impeachment is an attack upon the present credibility of a witness, and an impeaching witness who testifies that he knows the general reputation of the person attacked for truth and veracity will not be excluded from giving testimony as to such reputation at the time of the trial, and permitted only to testify to the reputation of the witness at a prior time. The true question is, what is his reputation at the time he testifies.

4. ———: MURDER: INSTRUMENT WITH WHICH CRIME COMMITTED. This indictment charged the murder to have been committed with a "bludgeon." The testimony left it in doubt as to whether death was produced by a blow with a bolt or club. The court instructed the jury that if the death was produced with a blow with a bludgeon, bolt, or club, it would be sufficient as to the manner of producing death. Such instruction was held correct.

5. ———: EVIDENCE: REASONABLE DOUBT. In criminal prose cutions the jury must be satisfied of defendant's guilt beyond a reasonable doubt from the *evidence*. They must not go outside of the evidence. Hence an instruction that the evidence includes not only the sworn testimony of the witnesses who have testified, but all the circumstances surrounding the tragedy, was erroneous.

6. ———: STATUTORY DEFINITION OF CRIME. While it is doubtless advisable and perhaps better to use the statutory language descriptive of a crime in an instruction, yet where words are used which convey the same meaning and import, and which cannot be misconstrued by the jury, the instruction may not be thereby rendered erroneous.

7. ———: INSTRUCTIONS TO JURY: DUTY OF TRIAL COURT. It is the duty of a trial court to submit to the jury, by way of proper instructions, such principles of law as may be applicable to the case on trial as it appears from the evidence, and also such principles as should be applied to witnesses who are interested in the result, or whose testimony should be weighed with special care and caution as accomplices. But it is not proper to discuss

the policy of using such witnesses. This should be left to counsel in the argument.

8. ———: TRIAL. The jury alone are the judges of the weight of evidence. Therefore an instruction that, "evidence of good character is entitled to great weight when the evidence against the accused is weak or doubtful, but is entitled to very little weight when the proof is strong," was held to be erroneous.

9. ———: INSTRUCTIONS examined together, and found erroneous.

10. ———: PRESUMPTION OF INNOCENCE. In the·absence of evidence to the contrary, the law presumes every one innocent, and this legal presumption of innocence is a matter of evidence, to the benefit of which the party accused is entitled. *Garrison v. The People*, 6 Neb., 275.

ERROR to the district court of Lincoln county. Tried below before HAMER, J.

*Hinman & Grimes, J. S. Hoagland*, and *Nesbitt & Heist*, for plaintiff in error.

Admission in evidence of confession of Ernest Meyers. *Priest v. State*, 10 Neb., 399. *Sharpe v. State*, 29 Ohio State, 264. *Dutcher v. State*, 16 Neb., 33. Impeachment of witness. *Olive v. State*, 11 Neb., 27. Refusal of court to admit record of conviction. 1 Greenleaf Ev., 468. Character of witness for truth and veracity. *Pratt v. State*, 19 Ohio State, 278. *Fisher v. Conway*, 21 Kan., 18. On the 11th instruction given by court, cited: *Walrath v. State*, 8 Neb., 87. *Williams v. State*, 6 Id., 340. *Curry v. State*, 4 Id., 554. On 17th to 20th instructions inclusive, cited: *Ogden v. State*, 12 Wis., 592. *People v. Davis*, 56 N. Y., 95. 3 Greenleaf Ev., Sec. 25. 2 Russell on Crimes, 785. *Ballard v. State*, 19 Neb., 617.

*John M. Thurston*, for plaintiff in error, cited: *Thompson v. State*, 30 Ala., 28. *State v. Arthur*, 23 Iowa, 430. *Pancake v. State*, 81 Ind., 93. *Claxton v. State*, 2 Humphrey, 181. *State v. Hurst*, 11 West Va., 54, and cases

cited.  *Ferguson v. State,* 49 Ind., 33.    *State v. Kring,* 64 Mo., 591.

*William Leese, Attorney General,* for the State, cited: Wharton Ev., Sec. 626.    *Com. v. Brown,* 121 Mass., 69. *People v. Buckland,* 13 Wend., 592.    Wharton Crim. Ev., Sec. 488.    *Clough v. State,* 7 Neb., 320.

REESE, CH. J.

Plaintiff in error was indicted by the grand jury of Lincoln county for the crime of aiding, abetting, counseling, inciting, and procuring one Ernest Meyers to murder Emily Bascombe, of said county, and the crime alleged as against Meyers consisted of murder in the first degree. Meyers seems not to have been apprehended, and the prosecution is against plaintiff in error, and so far as the trial is concerned was in the absence of Meyers and without any proceeding as against him.

The trial resulted in a verdict of guilty, and plaintiff in error was sentenced to be hanged.   He presents the case to this court by petition in error, consisting of forty-eight assignments of error.   It will not be our purpose to refer to all these assignments, for the reason that it is presumed that many of the questions presented by this record would not be raised or presented in a subsequent trial, and for the further reason that many of the assignments may be virtually disposed of without being referred to specifically.

The first objections to which our attention will be given are in reference to the proceedings of the court in the admission of testimony upon the trial.   Two objections are presented by counsel for plaintiff in error, in both of which it is urged with much force that the court erred in admitting in evidence the confessions of Ernest Meyers of his guilt of the murder of the deceased.

There is no doubt but that the proof of any such confession, made in the absence of plaintiff in error, would

have been and was clearly inadmissible, and if any such testimony was admitted over the objections of plaintiff in error, the action of the court in that behalf was erroneous.

The bill of exceptions is very lengthy, is not indexed, and it is difficult to give it that careful examination which we could give, were it in a more convenient form. So far as we have been able to discover, there were no confessions of Ernest Meyers, the principal, admitted in evidence over the objection of plaintiff in error. The witness Teideman was called to detail a conversation between himself and plaintiff in error, which was admitted over objections of plaintiff in error. This conversation consisted in statements made to plaintiff in error by the witness while detailing what Ernest had said, which was, in substance, that Ernest Meyers had told him, witness, that he, Ernest Meyers, and Eugene Meyers had committed the murder, stating the manner in which Meyers ·said it was done. The witness then stated that plaintiff in error said to him, that he, the witness, should have said that *Eugene* Meyers told him this. The evident purpose of this examination was to bring out the statements alleged to have been made by plaintiff in error to the witness, not for the purpose of proving substantively any confession made by Meyers to the witness. This was admissible.

One Eugene Meyers was called as a witness, who, it appears, was under indictment in some form, for this same offense, and in his testimony we find the following:

Q. Did you find out, or try to find out, who were the perpetrators of the deed?

A. Yes, sir.

Q. State if you have found out?

Defendant objected as incompetent, and calling for the conclusion of the witness. The objection was sustained.

Q. State, if you know, who did it?

To this question the same objection was made, but was overruled.

A.   Yes, sir, I know who did it. I know my brother, Ernest Meyers, said he did it.

No objection was made to this answer. Judging by the ruling of the court upon similar questions during the trial, we doubt not, had the attention of the court been challenged to the latter part of this answer, it would have been excluded. The question itself was not particularly objectionable, as it did not call for an answer as to who was the guilty party, but the witness then volunteered the statement that his brother Ernest, the principal indicted with the plaintiff in error, said he did it. It is a well established rule of criminal law, that the confessions of other persons, not made in the presence of the accused, are incompetent in any form. *Ogden v. State*, 12 Wis., 593. *Sharpe v. State*, 29 O. S., 263. *Dilcher v. State*, 42 Id., 173. *Priest v. State*, 10 Neb., 393. The statement, therefore, on the part of the witness, that he knew his brother Ernest said he did it, was incompetent, and had objection been made should have been stricken out. For this error, the court was not in any sense to blame.

The next objection to which our attention will be given, is the assignment that the court erred in refusing the plaintiff in error permission to put in evidence a record of the conviction of the witness Teideman of the crime of forgery. The witness in his cross-examination stated clearly and distinctly that he had been convicted of the crime of forgery by the district court of Arapahoe county, Colorado, and that he was sentenced to the penitentiary of that state, and served a part of the term for which he was sentenced, but was subsequently pardoned by the governor. The fact was clearly established also by the testimony of other witnesses, who knew him. It is true that section 338 of the civil code provides that the record of such conviction is competent evidence and proof of the fact; yet it also provides that the witness himself may be interrogated as to his previous conviction. This was done, and the conviction

unquestionably established and admitted. The record was competent evidence and proved the fact, but since it had already been established beyond any question, we can see no error in excluding the record, or at least no prejudice to plaintiff in error.

The defendant sought to impeach the testimony of the witness, Eugene Meyers, by showing his bad character for truth and veracity in the neighborhood in which he lived. The question was presented a number of times, in various forms, but our citations must be confined to one or two instances. We quote from the testimony as follows :

"John Keith was called and sworn.

"Q. Where do you live?

"A. At O'Fallon's Bluffs.

"Q. In this county?

"A. Yes, sir.

"Q. How long have you lived in this county?

"A. Most of the time for the last nine years.

"Q. How long have you known Eugene Meyers?

"A. I think I have known him since 1879.

"Q. Do you know what his general reputation is, in this community, for truth and veracity ?

"State objects as not within the time of this prosecution. Objection sustained. Defendant excepts.

"By Mr. Thurston :

"I now offer to prove by this witness, and other witnesses, the general reputation, at the present time, of Eugene Meyers in this community, where he lives, and has lived, for truth and veracity."

This testimony was excluded, to which plaintiff in error excepted.

In this ruling there was prejudicial error. The crime was alleged to have been committed on the 2d day of April, 1885; the trial was commenced on the 28th day of October, 1886. The court decided and held that in the testimony introduced for the purpose of impeaching the general

reputation of Meyers for truth and veracity, the defendant was limited to the time previous to the commission of the alleged crime. We know of no rule of law which will support this holding.

This question was before the supreme court of Kansas in *Fisher v. Conway*, 21 Kansas, 25, in which the following occurs in the opinion written by Judge Brewer: "Another matter of alleged error is in the ruling of the court in reference to impeaching testimony. It excluded all testimony of knowledge of the plaintiff's reputation for truth and veracity based upon rumors and reports since the commencement of the action. In other words the court made this inquiry, 'what *was* the plaintiff's reputation for truth and veracity before the commencement of this action,' and not 'what *is* his reputation to-day when he is testifying?' In this there was error. Impeaching testimony is for the purpose of discrediting a witness by showing that the community in which he lives do not believe what he says; that he is such a notorious liar that he is generally disbelieved. It is his present credibility that is to be attacked; is he now to be believed? What do his neighbors think and say of him at the present time? Not, what did they think and say months and years ago?" In *Pratt v. State*, 19 Ohio State, 278, the same question was passed upon and a like ruling had.

The court undoubtedly fell into this error by reason of the line of the examination of the witnesses for the defense. They were called for the purpose of testifying both to the good character of plaintiff in error, and to the bad character of the witness Meyers, or rather as to his reputation. The court very properly ruled that an inquiry as to the character and reputation of plaintiff in error as a peaceable and law-abiding citizen should be confined to the time of the alleged commission of the offense, and perhaps inadvertently fell into the view that the same rule must be applied to the impeaching testimony as directed against

Meyers. The principle upon which these two classes of evidence are admissible is entirely different. The first was for the purpose of ascertaining whether or not it was probable that plaintiff in error committed the crime laid to his charge at the time when it was alleged to have been committed. But with reference to the witness Meyers, inquiry was made whether it was probable he would testify to the truth at the time he was upon the witness stand, and not whether he was truthful at the time of the alleged killing.

A number of objections are made to the instructions of the court, some of which we will next notice. It is said that the court erred in giving instruction number five, given upon its own motion. This instruction is as follows: " Before you can find the defendant, Jefferson Long, guilty of aiding or abetting or procuring Ernest Meyers to commit murder in the first degree, by killing Emily Bascombe, as charged in the indictment, you must be satisfied beyond a reasonable doubt, first, that Ernest Meyers killed the deceased, Emily Bascombe, by striking her with a bludgeon, bolt, or club." * * . * * * * * The remainder of this instruction need not be quoted, as the objection is urged to the foregoing.

The indictment charged the commission of the murder with a certain " bludgeon." It is insisted that the words " bludgeon, bolt, or club" should not have been used in the instruction. The testimony failed to show the character of the instrument with which death was produced, the body of the deceased being almost entirely consumed by fire, the house in which she resided being burned over her body at the time of her death. There was some proof tending to show the description of an iron bolt or club soon after the death of deceased.

While it is necessary that the character of the instrument used in producing death should be alleged in the indictment and described, and that the proof must agree with the

allegations of the indictment, yet it is not essential that the testimony should prove the instrument to be the identical one charged, providing the death was produced in substantially the same way. It would not do to charge the defendant with the crime of murder by stabbing with a knife, and prove the murder to have been actually committed by striking with a club. Nor would it do to charge the murder to have been committed by shooting with a gun, and proving the act to have been by choking with the hand. But it is otherwise when the wound is produced by an instrument of the same class, as where it is charged that the death of the deceased was caused by a mortal wound on the head inflicted with a swingle, but it was proved that the death was caused by a blow on the head by a piece of wood. Wharton's Criminal Evidence, Sec. 92.

In Wharton's Criminal Law, Vol. 1, Sec. 519, it is said: "The common law rule in pleading an instrument of death is, that where the instrument laid and the instrument proved are of the same nature and character there is no variance; where if they are of opposite nature and character, the contrary. But if it be proved that the deceased was killed by any other instrument, as with a dagger, sword, staff, bill, or the like, capable of producing the same kind of death as the instrument stated in the indictment, the variance will not be material."

It is very clear that "bludgeon, bolt, or club," would be the same class or character of instrument, and would produce the same class or character of wound by striking, and there would be no variance from the allegation that death was produced by a bludgeon. The instruction of the court was therefore correct.

Objection is made to the eleventh instruction given to the jury, which is as follows: "In this case, if you should conclude from the evidence, which includes not only the sworn testimony of the witnesses who have testified, but all the circumstances surrounding the tragedy, that the

deceased was killed and murdered by Ernest Meyers, and that at the time she was killed some other person or persons were participating with Meyers, in the killing, and you are further satisfied beyond a reasonable doubt that before the killing the defendant requested, advised, and incited Ernest Meyers to do the killing, you will find the defendant guilty. In this case, if you should conclude from the evidence and all the circumstances of the case that the deceased, Emily Meyers, was killed and murdered by some person or persons other than Ernest Meyers, but that Ernest Meyers, while the other person or persons did the killing, knew that the killing was being done, participated in it by watching or any other manner, and you are further satisfied beyond a reasonable doubt that before the killing the defendant requested, advised, or incited Ernest Meyers to do the killing, you will find the defendant guilty; provided further, you are not to find the defendant guilty, although satisfied beyond a reasonable doubt that the defendant requested Ernest Meyers to do the killing, unless you are further satisfied beyond a reasonable doubt that Ernest Meyers in some way took part in the killing."

The objections to this instruction are, First, as to the first clause, which says: "If you should conclude from the evidence, *which includes not only the sworn testimony of the witnesses who have testified, but all the circumstances surrounding the tragedy,* that deceased was killed," etc. The words which we have italicized are objected to for the reason that it is claimed the court virtually instructed the jury that they were not limited to the testimony of the witnesses before them, but that in coming to their conclusion all the circumstances surrounding the tragedy, whether testified to or whether pertinent or not, should be considered by them. This language is perhaps objectionable, as the jury were not warranted in going outside of the testimony and proofs which had been introduced before them. The circumstances surrounding the alleged tragedy, as

proven, included the facts that the deceased and her husband were residing together in their house, upon the farm in Lincoln county; that their house was seen to be on fire about midnight of the day alleged as the date of the killing, although it was not known to be the house which was burning;. that on the next day, when the fact of the destruction of the house was discovered, a number of the citizens of that community went to the place and found a part of the remains of the deceased and the remains of her husband. If the remains of deceased were found at all, it consisted in nothing but the pelvic bones. The remains of her husband not burned were the head, shoulders, and part of the body. It was found that the front part of his head had been broken in, the brain exposed, and a large quantity of blood had run over his clothing and part of his face, which prevented their burning. The killing of these people and the circumstances, as detailed by the witnesses and shown upon the trial, doubtless attracted widespread comment and no little feeling, and it can be readily seen that the use of the language referred to in the instruction might have had a tendency to call the attention of the jury from the testimony of the witnesses, to which they should have been particularly and exclusively directed.

In *Thompson v. State*, 30 Alabama, 28, the accused was charged with the crime of forging two promissory notes. The trial court instructed the jury as follows: " That if they find from the proof that the name of William Nice was attached to the note when he received it, and that he received it from the prisoner, they may infer from this, if it is unexplained, and other circumstances in the case, that the prisoner put the name of Nice to said note." The supreme court, in the opinion written by Rice, chief justice, says: " In the charge of the court excepted to by the defendant in this case, it is assumed that there were other circumstances in the case. The credibility of the evidence tending to prove 'these other circumstances,' was

not left to the jury. In thus assuming the existence of 'other circumstances,' without referring to the jury the credibility of the testimony by which they were assumed to be so, the court below erred, if it is manifest that without the existence of other circumstances than those distinctly referred by that charge to the determination of the jury, the inference which it authorized the jury to draw was not legitimate." The judgment of the trial court was reversed on that ground alone.

Again, it is insisted that the language of the charge, in which the words "requested, advised, and incited" were used, is not synonymous with the words "aid, abet, or procure," as used in the statute. Referring to the language of the statute, it will appear that if a person procure another to commit a crime, he is liable under the provisions of the section. (Criminal code, section 1.) The word "incite," as defined by Webster, is "To move to action, to stir up; to arouse, to spur on." To request, is to "Ask for earnestly; to express desire for; to solicit; to entreat; to address with a request." To advise, is "To give advice to; to offer an opinion as worthy or expedient to be followed; to counsel." The definition applicable to the word procure in the statute, is "To contrive, effect, or bring about; to affect; to cause." While it is preferable to use the statutory terms in cases of this kind, the language of the instruction is doubtless unobjectionable as being in contravention of the statute. Again, the following occurs in the instruction: "In this case, if you should conclude from the evidence and all the circumstances of the case, that the deceased, Emily Meyers, was killed and murdered by some person other than Ernest Meyers, but that Ernest Meyers, while the other person or persons did the killing, or knew the killing was being done, or participated in it by watching, or in any other manner, and you are further satisfied beyond a reasonable doubt that before the killing the defendant requested, advised, or incited Ernest Meyers

to do the killing, you should find the defendant guilty,"
etc.

The use of the name of *Emily Meyers*, for Emily Bas-
combe, is objected to. This was simply a clerical error on
the part of the court, a misuse of the name, as no such per-
son as Emily Meyers had been killed, or was alleged to
have been killed, and as the indictment charges the killing
of Emily Bascombe, it is quite possible that no prejudice
resulted from this mistake, but its effects need not be dis-
cussed here, as the mistake will not likely again occur.

.The remaining portion of the above instruction is also
objected to on account of the use of the words, " or in any
other manner." That is, if the jury found that Ernest
Meyers participated in the killing, by watching, or in any
other way, that he would be guilty of the crime as princi-
pal, and that the allegations of the indictment would be
sustained, if plaintiff in error was found to be guilty as
charged. This instruction, while not, perhaps, as definite
as it might be, is not objectionable on account of this lan-
guage. If plaintiff in error procured the murder by Ernest
Meyers, and in doing so, the part acted by him, Meyers,
was in watching, or in any other manner of *participation*,
he would be guilty as principal, and not as an aider or
abettor, and, therefore, the instruction was right, if the
murder was committed as charged.

The twelfth instruction is objected to. It is as follows:
" When the state seeks to prove the guilt of the defendant
by the testimony of persons indicted for participation in
or any connection with the same crime, the testimony of
such persons ought to be received with care and caution,
and if the witnesses testifying for the state appear to be so
testifying with the expectation or hope of receiving immu-
nity from criminal prosecution, under the belief that the
testimony given against the accused will tend either to save
them from prosecution or acquit them on their own trials,
you will scan such testimony carefully and seek for facts

to corroborate it, but whether corroborated or not, if you
are satisfied of its truth you should not hesitate to declare
your convictions by your verdict, and you will remember
that the only chance to bring offenders to justice and to
protect the lives and property of honest citizens is often
that which is offered by allowing one offender to turn state's.
·evidence and to escape that another may be convicted and
punished, and I charge you that you may believe that the
witnesses Teideman and Meyers have a guilty knowledge
of the killing and murdering of the Bascombes, and yet it
is your duty to find the defendant, Long, guilty, if you are
·satisfied, beyond a reasonable doubt, that he aided, abetted,
·or procured Ernest Meyers to commit or participate in the
murder, if there was a murder."

The principal objection made to this instruction is the
language therein, "And you will remember that the only
chance to bring offenders to justice and to protect the lives
and property of honest citizens is often that which is offered
by allowing one offender to turn state's evidence and to
·escape that another may be convicted and punished."

It is quite difficult to understand the legal effect of this
language. We see no proposition of law embodied in it.
It was entirely proper that the jury should be cautioned as
to the testimony of witnesses accused of complicity in the
crime with which the plaintiff in error was charged, but
not proper to remind them that "the lives and property of
honest citizens" could at times only be protected by the
use of such witnesses. It is the province of the trial court
to submit to the jury by way of instruction such principles
of law as may be applicable to the case on trial, but the
policy of using the evidence of an accomplice, aside from
a declaration of the law applicable thereto, should not be
discussed in the instructions to a jury. The language
objected to should have been omitted.

Objection is made to the fourteenth instruction given to
the jury by the court, which is as follows: "Good char-

acter is an important factor with every man, and never more so than when he is on trial charged with an offense, and where evidence of good character is before the jury, it is their duty to give it such weight as they think it is fairly entitled to. Evidence of good character is entitled to great weight where the evidence against the accused is weak or doubtful, but is entitled to very little weight when the proof is strong."

This instruction was given in view of the fact that a number of witnesses who were acquainted with the character and reputation of plaintiff in error, and had known him for a number of years, testified that his character and reputation as a peaceable and law-abiding citizen were good.

In Wharton's Criminal Evidence, section 66, it is said: "It has been argued by high authority that good character is of weight only in doubtful cases, but the better opinion is to the contrary. In the first place it is conceded that evidence of character, when offered by defense in criminal cases, is always relevant. Technically, therefore, it is always material. To this it is answered that the court when admitting it as relevant does not decide its materiality, materiality being for the jury. But this virtually concedes that the question is one of logic and not of law. It makes the weight of evidence as to character dependent, not on any rules arbitrarily pre-assigned, but on the facts of each particular case.

"The weight to be attached to evidence as to character, in fact depends as much on the quality of character sought to be established as on the quality of the evidence produced on the opposite side."

In this case there was no testimony introduced attacking the character of plaintiff in error. A number of witnesses on his behalf declared it good.

It is said by Wharton: "A character such as that of Mr. Wilberforce, for instance, if offered on the part of a defendant charged with larceny, would cast a reasonable doubt

Long v. State.

upon any prosecution, no matter how strong its case might be."

In *Remsen v. The People*, 43 New York, 6, an instruction quite similar to the one under consideration was given by the trial court. In examining these instructions, Allen, judge, said: " It was error to charge the jury that in any case evidence of good character would be of no avail. There is no case in which the jury may not, in the exercise of a sound judgment, give a prisoner the benefit of a previous good character. No matter how conclusive the other testimony may appear to be, the character of the accused may be such as to create a doubt in the minds of the jury, and lead them to believe, in view of the improbabilities, that a person of such character would not be guilty of the offense charged, when the other evidence in the case is false, or the witness mistaken. An individual accused of crime is entitled to have it left to a jury to form their conclusions, upon all the evidence, whether he, if his character was previously unblemished, has or has not committed the particular crime alleged against him. The weight of the evidence is for the jury alone to determine.

"Instructions to juries, in substance and character like those given in this case, are condemned by writers of authority upon evidence and upon common law, who unite in saying that the good character of the party accused is an ingredient which ought always to be submitted to the consideration of the jury. It is not submitted to the jury when they are told that it will be of no avail in a given class of cases. *     *     *     *     *     *

" Evidence of good character is one of value in doubtful cases and in prosecutions for minor offenses, but is entitled to be considered when the crime charged is atrocious, and also when the testimony tends very strongly to establish the guilt of the accused. It will sometimes of itself create a doubt, when without it none would exist." *Cancemi v. People*, 16 New York, 501. *Stephens v. People*, 4 Parker,

396. *Harrington v. The State,* 19 O. S., 264. Maxwell's Cr. Pr., 628.

The question as to the weight of this testimony was entirely for the jury, and it was therefore error for the court to instruct them that it was entitled to little weight when the proof was strong.

The seventeenth instruction is also objected to. It is as follows:

" The witness Teideman has testified that he told the defendant Long that Ernest Meyers' had told him the story of the killing, being, in substance, that he, Ernest, and Eugene committed the murder; that Ernest was acting as watchman while Eugene was doing the killing; that Mrs. Bascombe, after Eugene had shot the old woman, jumped out of the window and ran down towards where he, Ernest, was lying. He did not try to catch her, but that Eugene took after her and caught her by the hair of her head, and killed her with an iron bolt, and dragged her back, and then hit the old woman on the head with the bolt, and then threw them both on the bed and threw all the oil he could find over them, and set fire to the bed, and that Long then told him, Teideman, that he should have said Eugene told him, Teideman, this; and Teideman further testifies, as a matter of fact, he, Teideman, had never had any conversation with Eugene Meyers about the killing. The court instructs you concerning this testimony, that if the defendant Long was endeavoring in any way to change Teideman's statements of what Ernest Meyers had told him, that is a circumstance against him. If Long in any way undertook to remodel the stories to be told concerning the killing it should be construed against him.

" In the writing marked Exhibit 'F,' which was written by Long to Teideman, the defendant Long, among other things, says: 'If you had only have said that you and Eugene was talking of the affair, and Eugene said he done the work, and if you ever told it that would be the last of

you, so you can fix it yet; they are after him hot, and it won't take much to get him.' This would seem to suggest a change in the story to be told to the counsel. Eugene is to do the killing, and Teideman is to get the story of the killing from Eugene. Long also seems to be anxious for the welfare of Ernest Meyers, and anticipates his arrest. This suggests an interest that no innocent man should have. This of itself may not show that the defendant Long committed, or procured Ernest Meyers to commit, the murder, if there was a murder. You are to be the judges of what this may mean; you are to determine the facts in the case, and all I desire to do is to call your attention to this exhibition of interest upon the part of the defendant in the story that should be told, and his apparent fear that Ernest Meyers may be arrested and possibly suffer the consequences of the story that Teideman tells, to the effect that Ernest Meyers told him that he did the killing."

This instruction is objectionable for several reasons:

First, too much prominence is given to the testimony of the witness Teideman, and to the letter quoted in the instruction. *Markel v. Moudy*, 11 Neb., 218. *Korsenbrock v. Martin*, 12 Id., 376. Again, the court should not have told the jury that if "defendant Long was endeavoring in any way to change Teideman's statement as to what Ernest Meyers had told him, that is a circumstance against him." It was for the jury to determine what circumstances were or what were not against plaintiff in error. It was competent for the trial court to submit the facts to the jury, and not proper that any opinion should have been expressed as to the effect or consideration to be given to these facts. Again, it is said, referring to the letter: "This would seem to suggest a change in the story to be told to the counsel. Eugene is to do the killing and Teideman is to get the story of the killing from Eugene." It was for the jury alone to say what the letter suggested, and the purpose of Long, if any, in saying what he did. We

quote again from the instruction: "Long also seems to be anxious for the welfare of Ernest Meyers, and anticipates · his arrest, and suggests an interest that no innocent man should have." Again, it is said: "You are to determine the facts in the case, and all I desire to do is to call your attention to these exhibitions of interest upon the part of defendant in the stories that are to be told, and his apparent fear that Ernest Meyers may be arrested and possibly suffer the consequences of the story that Teideman tells, to the effect that Ernest Meyers told him that he did the killing."

No further notice of this need be taken than to reiterate what we have before said, that it was the province of the jury alone to ascertain as to what the letter suggested, and not for the court. It was improper for the court to call the attention of the jury to "this exhibition of interest upon the part of defendant." It was not proper for the court to tell the jury there was an "exhibition of interest," nor that it "suggested an interest that no innocent man should have." All deductions should have been left to the jury. The instruction was erroneous and no doubt highly prejudicial to plaintiff in error.

The eighteenth, nineteenth, twentieth, and twenty-first instructions, all of which are objected to, will be considered together. They are as follows:

"18. With respect to the testimony of Mrs. Meyers, I charge you that she may have testified to the truth as she understood it, or she may have been guided by the mother instinct, seeking to protect Eugene, who is now under arrest, and to attract attention to her other son, Ernest, who is now at large and may not be regarded by her as in much danger of arrest. She may have reason to believe that both sons are guilty, and seek to protect the one who has been arrested."

"19. You have a duty to perform as jurors. It is to search for the truth in this case, and then to declare it, whatever it may be. If through sympathy for the ac-

'cused or for his family, or friendship for his counsel, or any other cause, you fail to declare your honest convictions, you disgrace the position you have been selected to fill, and are unworthy of the respect and confidence of your neighbors and all honest persons. Do not misunderstand me! I do not tell you to find the defendant guilty. I do not tell you to acquit the defendant. I tell you to discharge your duty as jurors. If you should find the defendant guilty without sufficient evidence you would commit an unpardonable wrong that can never be remedied."

"20. Should you turn him loose in the face of testimony to justify his conviction, you encourage murder and crime and invite the lawlessness of the mob which executes its victims without trial. It is because juries refuse to do their duty by declaring their honest convictions, that the law is often disregarded, that courts are often looked upon as objects of contempt, and the citizen rights his wrongs with the rough remedy of a rope in the hands of a mob. While the court requests you to declare your honest convictions, it also would impress upon you with equal earnestness that you must not find defendant guilty unless the evidence satisfies you of his guilt beyond a reasonable doubt."

"21. In conclusion, I will say that it is doubtful whether some of the speeches to which you have listened during the progress of this trial may be surpassed in eloquence by any one speaking the English tongue, but you are to remember that these speeches are of value to you only as they call your attention to the facts proven in the case, and enable you to ascertain the truth, and you will dismiss from your minds, so far as you can, the music, the literature, the rhetoric, and the emotion of these speeches, and dwelling only upon the evidence in the case, you will proceed as dispassionately to measure it, and to declare whether it is sufficient to convict the accused, as you would proceed to measure and declare the number of

bushels in a bin of wheat, or the number of yards in a box of prints, and while you are making your measurements, you will give the accused the benefit of all reasonable doubts, and when you have made it, you are to declare the result honestly and fearlessly, and regardless of consequences."

These instructions contain a mixture of law and argument, which should not be encouraged. It was for the jury to ascertain the truth or falsity of the testimony of Mrs. Meyers, giving to it such weight as they might think it entitled to. It was entirely proper that they should be admonished of the importance of the case confided to them, but unnecessary to inform them of the possible results of the failure of juries to discharge their duties. Not necessary to tell them that if they should "turn the plaintiff loose in the face of testimony sufficient to justify his conviction, that they would encourage murder, and invite the lawlessness of the mob."

The reference to the arguments of counsel, in the manner here presented, was hardly necessary; neither did there seem to be any occasion for inviting the jury to dismiss from their minds "the music, the literature, the rhetoric, and the emotion of these speeches, and dwelling only upon the evidence in the case," as if they were proceeding to dispassionately measure it, and to declare whether it was sufficient to convict the accused, as they "would proceed to measure and determine the number of bushels in a bin of wheat, or the amount of goods in a box of prints."

The eighth instruction asked by the plaintiff in error to be submitted to the jury was as follows: "In the absence of evidence to the contrary, the law presumes every one innocent, and this legal presumption of innocence is a matter of evidence, to the benefit of which the party is entitled. The burden of proof is on the state to satisfy the jury of his guilt. Even if he introduces no evidence at all to overcome or explain that against him, the jury should

acquit him, unless the evidence introduced by the state satisfies you beyond a reasonable doubt that he is guilty as charged in the indictment."

This instruction was refused, and to the refusal plaintiff excepted. A part of the instruction was given to the jury by the court on its own motion, to the effect that the law presumed plaintiff in error innocent, until the contrary was proved. But they were not informed that "the legal presumption of innocence was a matter of evidence, to the benefit of which plaintiff in error was entitled.'"

This part of the instruction was evidently copied from the syllabus of the opinion written by the present chief justice in *Garrison v. People*, 6 Nebraska, 275. It should have been given.

Upon the question presented, that the verdict is not sustained by sufficient evidence, we express no opinion, as the cause will probably be retried, and it may not arise on such trial.

For the reasons above given, the judgment of the district court is reversed; the motion for a new trial sustained, and the cause remanded for further proceedings according to law.

REVERSED AND REMANDED.

THE other judges concur.